Mildred L. Clarke, Transferee v. Commissioner.
Clarke v. Commissioner
Docket No. 19871.
United States Tax Court
1950 Tax Ct. Memo LEXIS 92; 9 T.C.M. (CCH) 826; T.C.M. (RIA) 50228; September 22, 1950
Briggs G. Simpich, Esq., 837 Woodward Bldg., Washington 5, D.C., and Walter H. Murphy, Esq., Central Bank Bldg., Lynn, Mass., for the petitioner. Paul H. Lipton, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income tax against Ernest H. Clarke, deceased, of $47,202.94 and $278,714.81 for the years 1943 and 1946 and transferee liability of $200,775 against petitioner as transferee of decedent's assets in that amount. The correctness of the deficiencies determined against the decedent is not in issue. Findings of Fact The petitioner is an individual residing at 467 Central Street, Saugus, Massachusetts. She is the widow of Ernest H. Clarke, who died October 1, 1947. Clarke filed federal income tax returns for the calendar *93 years 1943 and 1946 with the collector of internal revenue for the district of Massachusetts. On July 29, 1947, July 30, 1947, and August 29, 1947, Clarke delivered to petitioner checks drawn on his account at the National Shawmut Bank, Boston, Massachusetts, for $10,000, $20,000 and $27,000, respectively. The checks were cashed by petitioner and the proceeds of the first two checks were placed by her in her safety deposit box. The proceeds of the third check were deposited in her checking account. These transfers were made by Clarke to petitioner without consideration. On or about September 4, 1947, Clarke delivered to petitioner certificates evidencing 900 shares of stock of the American Telephone and Telegraph Company. The certificates had been endorsed in blank by Clarke and were delivered by her to Clarke's broker for transfer to her name. The stock was so transferred and she received the certificates therefore from the broker on September 9, 1947. The stock on that date had a fair market value of $143,775. Immediately or very shortly thereafter she sold the said shares and placed the proceeds in her safety deposit box. Exclusive of 1500 shares of Clarke Distilleries, Ltd. *94 , Clarke's assets and the fair market value thereof on July 29, 1947, after payment of the $10,000 check above, were as follows: Cash
$ 94,414.75
Shawmut Bank Checking Accounts
$69,273.22
Richford National Bank
23,092.49
Richford Savings Bank
1,249.04
Shawmut Bank Safe Deposit Box
800.00
Real Estate
13,500.00
Listed Securities
155,062.50
U.S. Bond
1,037.50
100 shs. Consolidated Edison
2,612.50
100 shs. N.E. Airlines
425.00
100 shs. Pan American Airways
1,025.00
200 shs. S. Pacific
8,550.00
900 shs. American Tel. & Tel.
141,412.50
Unlisted Securities
6,250.00
150 shs. E. H. Clarke, Inc.
No value
2000 shs. New Brunswick Oil Field
6,250.00
Miscellaneous Personal Property
4,825.00
Total
$274,052.25
As of the same date Clarke had admitted liabilities as follows: National Molasses Com-
pany
$ 66,981.55
Brookline Savings Bank
15,541.34
1943 Income Tax Defi-
ciency
47,202.94
Interest: 3/15/44 to
7/31/47
9,564.74
1946 Income Tax Defi-
ciency
278,714.81
Interest: 3/15/47 to
7/31/47
6,307.35
Total
$424,312.73
Except for the reductions in cash by reason of the checks above and the slight *95 increase in the value of the shares of American Telephone and Telegraph stock, there was no substantial variation in the value of Clarke's assets from July 29, 1947 to October 1, 1947, the date of his death. Between July 29, 1947 and October 1, 1947, there was some increase in Clarke's liabilities by reason of federal gift tax incurred on the gifts made to petitioner as evidenced by the said three checks and the certificates of American Telephone and Telegraph stock. For a number of years Clarke was the exclusive distributor for an alcoholic beverage known as Southern Comfort for the Atlantic Seaboard territory extending from the District of Columbia to Maine. In 1944, or quite early in 1945, Clarke and Francis Fowler, President of the Southern Comfort Corporation, conceived the idea of producing a beverage somewhat similar to Southern Comfort which was to be known as Northern Comfort, the formula therefor to be furnished by Fowler. To procure alcohol for the venture they first had in mind the acquisition of a distillery located in Idaho which manufactured alcohol from potatoes. That plant was not for sale and Clarke at a later date discussed with Samuel G. Fisher the idea of building *96 such a distillery in the state of Maine. Fisher with his partner, Joshua Epstein, owned twenty-five per cent of the stock of the corporation which owned the Idaho distillery. They were also the owners of Acme Coppersmithing and Machine Company of Oreland, Pennsylvania, a partnership which had built the Idaho distillery. Early in 1945 Clarke and Fisher went to Maine in search of a suitable location and property. At Caribou they found an old starch factory which was not then in operation. They became convinced that an adequate supply of potatoes would be available for profitable operation of a distillery which would produce 10,000 proof gallons of alcohol a day. They purchased the starch factory and converted it into a distillery. The price paid for the starch factory was $35,000. At some date not shown Fowler advised Clarke that he was not interested in the project and that he would not furnish a formula for the beverage to be known as Northern Comfort. Clarke, Fisher and Epstein decided to proceed without Fowler, Clarke to have a one-half interest in the venture and Fisher and Epstein the other half. For these interests Clarke put up $150,000 in cash while Fisher and Epstein supplied *97 machinery for converting the starch factory into a distillery. This machinery was used machinery which Fisher and Epstein then had on hand and had a cost basis to them of $30,000. It was entered on the distillery books at that price. It was originally planned to operate the distillery through E. H. Clarke, Inc. E. H. Clarke, Inc. was a corporation belonging to Clarke through which he carried on his business as distributor of Southern Comfort. It was understood, however, that Fisher and Epstein were not to participate in any of the profits derived from Clarke's Southern Comfort business. This arrangement did not prove satisfactory and at some time around February 19 to 21, 1946, a new corporation to be known as Clarke Distilleries, Ltd. was organized under the laws of Maine for the purpose of owning and operating the distillery. For his cash contribution of $150,000 Clarke received 50 per cent of the stock, or 1500 shares, while Fisher and Epstein received the remaining 1500 shares for the machinery and equipment they had supplied. At or about that time Clarke was advised by the Southern Comfort Corporation that thereafter his territory would be limited to New England and his commissions *98 would be reduced. Clarke felt that he had not been treated fairly in that he had built up the Southern Comfort business to a very high point throughout his entire territory. After consideration of the matter and further negotiations, Clarke decided to sever his relations with the Southern Comfort Corporation and in March of 1946 he received a check in settlement of all rights and claims against that corporation. The amount received was in excess of $200,000. Considerable difficulty was experienced in getting the distillery into operation and in keeping it in operation. Most of the starch plant machinery was used and while some of it was good, some was very old. Pumps and some other unnamed items in the first shipment of the machinery from Fisher and Epstein were in poor condition. Theriault, a mechanical engineer who was employed by the company in setting up and operating the distillery, reported the matter to the management who advised him that no other machinery was available and that they would have to get along with what they had. The machinery at hand was utilized and the plant was put into operation in April of 1946. By means of repairs and replacements the plant was gradually *99 built up and in 1947 it was a very good distillery. At some time, presumably during 1946, the operation was changed from the production of beverage alcohol to industrial alcohol. An industrial alcohol plant was permitted to operate seven days a week as against six days for a beverage alcohol plant. A major difficulty from the operating standpoint was lack of an adequate potato supply. Clarke and Fisher, when they made their original investigation, had been led to believe that the available supply of culls and seconds in Maine would be sufficient for satisfactory operation of the plant. Actual experience proved this belief to be in error at least during the period of Clarke Distilleries' operations. Most, if not all, of the potatoes used were purchased under the subsidy program of the federal government. Under this program petitioner would pay the established market price for potatoes and would then be reimbursed by the government in an amount equal to the subsidy payment. During the first twelve months petitioner operated chiefiy on No. 1 potatoes for which the net cost was 20 cents per 100 pounds. The culls and seconds were not available as had been anticipated and in May, 1947, *100 the distillery was forced to shut down. Among the contributing factors were the shipment under government supervision of a quantity of potatoes to Canada and inability, due to weather conditions, to get culls and seconds from piles in the fields. In July of 1947 Fisher went to Washington and negotiated a contract with the Commodity Credit Corporation for 63,000,000 pounds of potatoes at 13 1/2 cents per 100 pounds. It was thought that that quantity would be sufficient for continuous operation until the harvesting of the Maine crop began in the fall. In September, after approximately 20,000,000 pounds of potatoes had been delivered, the petitioner was notified of the cancellation of its Commodity Credit Corporation contract. Shipments of potatoes were to be made to Europe for the feeding of people in European countries. Fisher went to Washington and endeavored to obtain reconsideration and to procure the shipment of more potatoes. His efforts were unsuccessful and in October, after the supply of potatoes then on hand was used up, the distillery was closed and it was not operated again under the ownership of Clarke, Fisher and Epstein. Fisher was in Washington at the time of Clarke's *101 death and upon receiving notice of his death went directly to Boston. The production of alcohol by proof gallons by Clarke Distilleries, Ltd. from the beginning of its operations in April, 1946, through October, 1947, was as follows: Finished Spirits
1946
Produced
April
None
May
40,738.5 p.g.
June
22,198.0
July
91,808.3
August
144,939.4
September
20,504.0
October
November
124,350.0
December
231,365.8
675,904.0 p.g.
1947
January
227,900.5 p.g.
February
253,430.4
March
298,350.1
April
229,541.7
May
53,611.9
June
July
August
93,145.9
September
251,537.0
October
52,104.3
November
December
1,459,621.8 p.g.
In order to procure money for operating purposes Clarke Distilleries established a line of credit with the Depositors Trust Company, Augusta, Maine. Under this arrangement the bank agreed to advance up to $250,000. As a condition, however, it required the personal guaranty of Clarke, Fisher and Epstein. Clarke personally signed a guaranty for $250,000 on September 25, 1946. Under this line of credit the bank was to advance money for the purchase of potatoes up to the amount of repayment the distillery was to receive *102 from the federal government under its subsidy program. At July 31, 1947, notes payable, exclusive of notes on real estate loans of the Clarke Distillery amounted to $229,914.00. At September 30, 1947, its notes payable to the bank amounted to $251,500. The arrangement between the bank and the distillery was not a happy one. The bank repeatedly had to ask for the required information concerning the distillery's operation and at one time it was discovered that the distillery had been drawing on its credit at the bank for the full amount paid by it for potatoes and not merely the amount for which the distillery was to receive payment under the federal government subsidy program. There was also some question at one time whether the distillery was making the required payments on the loan as it liquidated its inventory. At one point the president of the bank suggested that the bank would be happy if the distillery would liquidate its loan and procure its credit elsewhere. In July of 1947 the distillery undertook to procure fuel oil for the purpose of renewing its operations. The Mexican Petroleum Company would not supply the oil except on personal guaranty of the stockholders. Clarke signed *103 such a guaranty. The balance in the machinery and equipment account of Clarke Distilleries at February 28, 1947 was $89,821.57. The books also carried an account designated new construction, and the balance in that account at February 28, 1947, was $238,359.85. At some time, presumably in the fall of 1946, a potato storage house was constructed at a cost of sixty to seventy thousand dollars. From monthly balance sheets submitted to the Depositors Trust Company it appears that with the exception of comparatively small additions or reductions these accounts remained static through October of 1947, allowances for depreciation being made. From the balance sheets it appears that the distillery building was carried on the books of the company at $30,000 and land at $5,000. Throughout the period from the beginning of operations through October of 1947, the distillery could market at a good price all of the alcohol it could produce and the indications were that if it could have procured potatoes at prices comparable to the prices it paid for those it did buy and in quantities sufficient for regular operation at some stage approaching capacity its operations would have been profitable. *104 In 1947 it had commitments for more alcohol than it was able to produce. It undertook to fill those orders by the purchase of alcohol from other distilleries. The amount so acquired and resold was comparatively small. The company's books and accounts were kept on the basis of a fiscal year ending February 28. From its distilling operations it suffered a loss for the fiscal year ended February 28, 1947 in the amount of $201,714.38. From side operations not related to its distillery business, the exact nature of which is not clearly disclosed, it realized substantial profits to the end that its deficit for the year was reduced to $34,247.09. The transaction from which the major portion of the profits was derived was set up on the company's books as "Sale of Grain Allocation." After the Department of Agriculture had raised some question as to the nature of the transaction the style of this account was changed to "Derived from interests in spirits or whisky produced from grain. See bills and correspondence in explanation." From its operations for a period beginning March 1, 1947, and ending July 31, 1947, Clarke Distilleries had an operating profit of $32,598.29, for the period from *105 March 1 to September 30 in an operating profit of $24,123.24, and for the period from March 1 to October 31, 1947 an operating profit of $40,438.34. [1]
*106 On or about June 7, Troy, Clarke's attorney, visited Clarke at his home. Clarke expressed concern over his personal guaranty of the distillery's line of credit and of the size to which the loan thereunder had grown. He stated that he would like to get rid of his stock, suggesting that Troy speak to Fisher and Epstein and that he would sell to them at a big loss if they would release him on the guaranty or indemnify him against any claim of the Depositors Trust Company. He expressed a willingness for Troy to have all over $50,000 he could get for his stock. On or about June 18, 1947, Fisher was in Boston and expressed dissatisfaction with the way things were going. Due to Clarke's illness he thought the office should be removed to Philadelphia where he and Epstein could run the business without having to come to Boston. Troy suggested that they buy Clarke's stock and have entire control of the business. Fisher did not reply at once but later in the day when the matter was mentioned again, his response was: "With that guaranty outstanding there is no use discussing it." In a letter dated October 1, 1947, replying to a letter from Troy under date of September 23 advising Epstein and *107 Fisher of a discussion with a representative of the Barton Distillery Company of Chicago, relating to possible sale of the distillery, Epstein concluded by saying: "Needless to say, we are just as anxious to sell this plant as Mr. Clarke is, if for no other reason than to terminate the relationship which left a very bad taste in my mouth." On or about March 1, 1948, Clarke's estate transferred its stock in Clark Distilleries, Ltd., to Barton Distilling Company of Chicago, Illinois, in consideration for the assumption by that company of whatever liability Clarke had on any account because of the distillery. The Barton Company resumed operations for a short time with a resulting loss. It closed and dismantled the plant. According to the balance sheets submitted monthly to the Depositors Trust Company by Clarke Distilleries, Ltd. in support of its line of credit the book value of the 3000 shares of Clarke Distilleries, Ltd. stock at July 31 was $179,785.25. At September 30, 1947, it was $175,678.83 and at October 31, 1947, $195,329.07. The 1500 shares of stock in Clarke Distilleries, Ltd. belonging to Clarke at the date of his death was on that date and on July 29, 1947, of uncertain *108 and speculative value. At no time during the period between those dates did its value exceed $75,000. Opinion TURNER, Judge: The question for determination is whether or not petitioner is liable as transferee under section 311 of the Internal Revenue Code to the extent of $200,775 for admitted deficiencies in the income tax to Ernest H. Clarke, deceased, for the years 1943 and 1946 of $47,202.94 and $278,714.81. The petitioner admits that cash and property totaling $200,775 were transferred to her by Clarke on July 29, July 30, August 29, and September 9, 1947, and that these transfers were made without consideration. She also admits that at the time of the first transfer Clark's liabilities were $424,312.73 and that they were not thereafter reduced but rather were increased to the extent of the gift taxes due on the transfers made to her. Exclusive of the 1500 shares of stock in Clarke Distilleries, Ltd., we have found that the value of Clarke's assets on the date of the first transfer was $274,052.25, the value claimed therefor by petitioner in her brief and in that connection it may be noted that the respondent in his reply brief took issue only with *109 the value claimed by petitioner for the distillery stock. The parties are agreed that except for the cash and American Telephone and Telegraph Company stock transferred to petitioner there was after July 29, 1947 no substantial change in the value of Clarke's assets. Accordingly, the answer to the question of Clarke's solvency depends on the value of the 1500 shares of stock in Clarke Distilleries, Ltd. By simple arithmetic it appears that at all times after the cashing by petitioner of the $10,000 check on July 29, 1947, Clarke's liabilities exceeded his assets, exclusive of the distillery stock by $150,260.48 and it thus appears that after and by reason of the first transfer, Clarke was at all times insolvent unless the value of the 1500 shares of distillery stock exceeded that amount. The petitioner claims that the fair market value of the 1500 shares of Clarke Distilleries, Ltd. stock on July 29, 1947 and at all times here pertinent was $523,971.94, while the respondent contends that the stock was of no value. That the value contended for by petitioner for the stock of Clarke Distilleries, Ltd. is artificial and unrealistic in the light of the picture shown by the evidence requires, *110 in our opinion, little comment. The fact is that the distillery never became an established and profitable business. At no time was it ever in a position to operate on its own rather than the credit of its individual stockholders. Not only was this true as to the purchase of its raw material in respect of which some use of a line of bank credit might well have been reasonable, but in the summer of 1947 when it was seeking to renew operations after procuring potatoes through the Commodity Credit Corporation it was unable to obtain the fuel oil needed to start its machinery until payment therefor was guaranteed by Clarke. The attitude of the stockholders themselves toward the stock in the summer of 1947 rather definitely indicates lack of confidence in the future prospects of the business. Complete abandonment of the operation in October, after the potatoes acquired under the Commodity Credit Corporation contract were exhausted and just at the time when the local crop would begin to be available, certainly does not support or corroborate any claim that from the time of the first gift by Clarke up to his death the available potato supply would be adequate for profitable operation. On *111 the other hand, we have not overlooked the fact that on the dates here pertinent the distillery mechanically was a good distillery or that the company could have sold at good prices more alcohol than it produced. Neither have we overlooked the argument of the petitioner based on an appraisal by items of the machinery and equipment, land and buildings as of February 28, 1946, nor her contentions as to value for the stock as demonstrated by a capitalization of a monthly average of earnings for February, March, April, May, August, September, and October of 1947. With respect to the February 28, 1946 appraisal, suffice it to say we are here valuing stock of the corporation at the indicated dates in 1947 and even though the machinery and equipment in the plant might have had a good market in 1947 as a part of the inventory of a concern engaged in selling such machinery, we are not concerned with a situation of that character here and furthermore, the petitioner has offered no evidence from which we might determine liquidating value for the machinery if the plant had been dismantled and the machinery and equipment sold on any of the pertinent dates. With respect to the claim of value based *112 on a capitalization of earnings, the petitioner by assertion rather than proof has selected as normal and representative the months above named and has wholly excluded June and July 1947 during which the distillery was closed for lack of potatoes and all months prior to February, 1947, during which the distillery sustained operating losses in excess of $200,000. She also gives no effect to the fact that for its operations from the beginning through October of 1947 its losses from operations exceeded $150,000. After careful consideration of all of the evidence offered by the parties and appearing of record, we have concluded and have found as a fact that on the dates of the transfers and on the date of Clarke's death his 1500 shares of stock in Clarke Distilleries, Ltd. was of uncertain and speculative value and that on none of these dates did its value exceed $75,000. It follows, therefore, that on the dates of the transfers of the cash and the American Telephone and Telegraph stock to petitioner, Clarke was insolvent and petitioner to the extent of such transfers is liable as transferee for the deficiencies in Clarke's income tax for 1943 and 1946. Decision will be entered for *113 the respondent. Footnotes
1. The findings as to operating profits for the period indicated are based on admissions of the parties in making their requests for findings and in presenting their arguments and not directly upon evidence of record. From the evidence submitted there is no way in which the operating profits for any of the periods mentioned can be determined with any exactness. Petitioner has asked for a finding that the operations for the period from February 1, 1947 to October 31, 1947, resulted in a profit of $65,051.64. This requested finding is based on balance sheets and supporting statements of operations submitted monthly to the Depositors Trust Company in support of its line of credit and on one balance sheet presented as evidence by petitioner as of October 31, 1947, together with a profit and loss statement for the period from March 1, 1947 to October 31, 1947, showing a net profit for the period of $42,638.02. Obviously, the balance sheets and operating statements do not support petitioner's requested finding. In the first place, even if the figures are taken from these sheets at face without any attempt to reconcile apparent discrepancies, $42,638.02 for the period from March 1 to October 31, 1947, plus $18,259.74 shown as the operating profit for February, total $60,997.76 and not $65,051.64 as shown by petitioner's requested finding. The respondent concedes an operating profit for the period of $40,438.34, hence that amount has been taken as the correct figure for the purposes of deciding the case. The amounts shown as operating profits for the periods March 1 to July 31 and March 1 to September 30 have been taken from operating statements attached to the various balance sheets. These are the amounts used by petitioner in its arguments and have been accepted for the purpose of these findings, since the respondent at no place contends for a lesser amount. There were some discrepancies with respect to opening and closing inventories as shown by the various sheets covering operations and it is not possible to determine the adjustments made with respect to the operating losses and profits in carrying the results into surplus. The books were not produced and we have no way of knowing with any exactness what the actual results of operations were. There is some evidence that in August of 1947 the books were being rewritten by someone in in the office of Fisher and Epstein at Oreland, Pennsylvania, on the theory that as previously kept they had not properly reflected the company's operations.↩